and Wallmeister, 23-1215 and 23-1250. I am told that all counsel is present. Mr. Stavsky, am I pronouncing your name correctly? You are, Your Honor. Thank you. And you have reserved two minutes for rebuttal. Yes, Your Honor. Okay, and Ms. Bideau, you'll let us know if you can't hear. Is that correct? That's correct, Your Honor. Okay. You may proceed with your rebuttal. May it please the Court. Again, my name is John Stasny. I represent the plaintiffs who are the primary appellants in this case. This is the second time that this case has been up before this Court, and I think one of the most important things that happened in the first appeal is that it solidified the structure of the case and how the claims flow, and I think that's critical to understanding the issues on appeal. This is not a case of individual claims between plan participants and the defendants. This is a case in which because this was not a top-hat plan, that issue was settled in the first appeal. This is a case in which the defendant's liability is to make the plan whole. I picture it as sort of a triangle. The defendants owe money to the plan, and that money that they owe is a product of what they took from the plan. That's how it's stated in this Court's opinion. It's what they took from the plan plus the lost investment gains on what they took. And then the individual plan participants, both the plaintiffs and non-parties, all participants, their claims run against that money that's in the plan. And so it's not claims directly between the participants and the defendants. And so that has created I think a lot of confusion in this case because prior to the first appeal we were kind of running on two alternative tracks. We didn't know who was going to prevail. Didn't the parties stipulate to the account balance? We ultimately stipulated to the aggregate, well, we agreed to the allocation among the different participants. There's no dispute over the allocation. But in doing so, the plaintiffs very expressly reserved the issues that they had raised at the very first bench trial hearing on remand. That was the hearing on June 3rd where there was a dispute over the evidence that the Court could consider on the aggregate balance. And that is where I want to start because one of the things that happened on remand... Could I just take you back to where you started because you did describe, as I understand it, the structure, the overall structure. But our prior decision did also recognize the contribution identification claim as between Laumeister and Lauderville. That's the one exception. It's an important exception. It is. It is. And I'm trying to pack a lot in. But that is the one claim that runs directly between parties. That's actually a very critical point. It's one of the problems that comes up in this issue of offset or charging Ms. Lauderville's interest in the plan. That absolutely is a claim that runs directly between defendants and Ms. Lauderville. But that is the only claim in the case that is directly between the parties. I absolutely agree with that. It's a critical point. And you agree that our prior decision recognized the viability of that claim. It did recognize the viability of that claim. And specifically, the Court said on remand it was open for the District Court to determine, to revisit the issue of the allocation of fault or the respective percentages among both defendants and Ms. Lauderville. Yeah. And CTC is missing from what the District Court did on remand on that. They are missing. There's no explanation for that. It was argued. It was absolutely argued below. It was brought up at least twice, I believe, in written motions to the Court to include CTC. The starting point would be a third, a third, a third, when you've got three defendants, if there's no other issues. But we've discussed in our brief why, in our opinion, Ms. Lauderville's share should be a lot less. And CTC and Mr. Laumeister, their share should be a lot more. And so I'll just refer to the brief on those points. Getting back to the issue of the overall plan balance that Your Honor raised, one of the reasons I talked through that structure is because that's a point where there are some facts relevant to sort of both legs of that triangle. This court on remand instructed the District Court to revisit the allocation of benefits in a way that would respect the vested rights of participants. In order to do that, and in order to come up with an accurate allocation of benefits, what we had to do was, that does require us to look at facts having to do with withdrawals from individual accounts. Because if money has come out to pay one participant, it affects both the aggregate plan balance, but it also affects that participant's portion relative to other participants. And so that's the one issue of fact that really is relevant both to the aggregate liability of defendants and to the allocation among participants. And so once we dove into that, one of the errors of the District Court was to say, all right, we can consider these withdrawals because it is important. We need to do that to come up with an accurate set of percentages. And that's going to reduce the aggregate plan balance that we're looking at for defendant's liability, but we're going to refuse to consider any other evidence of increases in that plan balance. And so that's why we say in our brief, the court essentially used the law of the case as a one-way ratchet to say, well, we can ratchet down the plan balance because we're looking at evidence of withdrawals. But we can't look at any other evidence that would actually increase that balance because it would violate the law of the case. Well, why wouldn't it violate the law of the case? You had conceded to that earlier base amount being accurate, right? So the base amount. And what we said in Brow-1 was using that amount, but you go 1997 to 2022 to judgment, not, I forget what year, 2004 because there wasn't a termination. And so why isn't it law of the case? Why wasn't the mandate from our first decision, go back, recalculate out to 2022? So I'm glad you used that term, base amount. That was a capitalized, defined term in the district court's orders, and there was a lot of confusion over that. In the very first set of findings, in fact, before the first appeal, that term was defined as a 1997 starting balance. I still agree that it's correct. That was a correct 1997 balance. The disputed period right now is what happened between 1997 and 2004, really. That's where this dispute comes in over the law of the case. But you hadn't disputed before what happened between, I think, tell me if I'm wrong, between 1997 and 2004. You agreed as to what happened there. It came up to us. We said 2004 is the wrong end point. Go to 2022. So why do you get to re-argue now what you conceded to before? Because many of the withdrawals that I'm talking about that were taken into evidence, that were considered on remand, based on this court's instruction, this court said you can conduct additional fact-finding in order to come up with a remedial scheme that protects the vested rights of participants. A lot of that evidence, in fact, the vast majority of those withdrawals, if you look at the record, were pre-2004. So we are already departing from the previously projected 2004 balance. That's the issue. That balance is no longer being kept in place. The court took into account withdrawals that happened prior to 2004. And so that balance has gone down, but the court is refusing to take into account other pre-2004 facts that would bring it up. That's why I say it's a one-way ratchet. But it was a one-way ratchet that you were participating in. It didn't come out of the blue. You were involved in stipulations. You know that this was, like, why is it now can you come back and realize upon the fact that it might not have been a good move or that it didn't benefit your clients? Can you revisit it? Well, no, Your Honor. We walked into the June 2022 hearing saying, all right, in order to be accurate, here's all the evidence we have to consider. And, yes, it includes pre-2004. And, no, I did not expect, the plaintiffs did not expect that there would be this selective application of the law of the case because that was my reading of this court's opinion was that we can have additional fact-finding. And because this is an individual account plan, that was recognized in the court's prior opinion, because this is an individual account plan, fact-finding on the individual balances necessarily affects the aggregate balance. It just does because all of the plan's assets are allocated among those accounts. And so when we went into that hearing, what we were doing was saying we have to do this fact-finding instructed by the court. Yes, it includes some pre-2004 facts that affect both individual accounts and the aggregate balance. But then what the court decided was, well, I'm going to take half of it. And that is what we believe the error was there. Thank you. Thank you, Your Honors. May it please the court. My name is Nicole Bodo, and I'm co-counsel to the appellees and cross-appellants in this case, CTC Corporation and the estate of Bruce Laumeister. I'd like to start by saying that I am not going to spend time discussing the base amount of $350,000 that was stipulated to by the Plaintiffs' Council, was determined in 2018, and this court instructed in 2021 on remand to calculate the earnings based upon the base amount in 2004. So as an overview, I'd like to note, Your Honors, that there are four main points to our cross-appeal and our request that this court reverse the decision by the district court to award benefits to plaintiffs Brow and Launderville, notwithstanding the running of the statute of limitations period on their claims. First of all, the benefits at issue in this case are strictly employer contributions. And this is important for Section 1344 of the United States Code, if it applies to this case, because there is a section of that code that requires any employee, any excess employee contributions to be reallocated among participants. That is not true of employer contributions. Secondly, all of the participants in the CTC plan have been paid their plan account balances, plus earnings calculated through the date of judgment. There are two plaintiffs, Brow and Launderville, who have not been paid any benefits because their claims are time barred and they have no standing to claim benefits, and are therefore not participants in this plan. Third, 29 U.S.C. 1344 is an allocation scheme for terminated plans. This court found in 2021 in this case that the plan had not been terminated, and even if it had been terminated or is being terminated, 29 U.S.C. 1344 does not establish entitlement to benefits as a matter of law. This court said in its 2021 ruling, the plaintiffs have not established their entitlement to benefits as a matter of law, and defendants may have viable defenses to those claims. And fourth, not requiring the defendants to pay the entire amount of the restoration award does not violate ERISA Section 403C, which states that the assets of a plan shall never inure to the benefit of any employer. There are several exceptions to that rule, one of which is discussed in Bennett v. Conrail, Matched Savings Plan, a case that was cited by this court in its 2021 ruling, that ERISA does not protect surplus assets of the employer and excess funds may be appropriately disposed of after claims have been paid out. So as I mentioned, Your Honors, the CCC plan was never terminated, as this court found in its 2021 decision. A termination that complies with neither the requirements of ERISA nor the terms of the operative plan itself is no termination at all, as stated by this court in 2021. But even if the plan had been terminated, Your Honors, the statute of limitations still applies. We have Supreme Court precedent on this issue. In Mead Court v. Tilly, the Supreme Court said that 1344 merely provides for the orderly distribution of plan assets, and there is nothing in the legislative history suggesting Congress intended 1344 to be a source of benefit entitlements rather than an allocation scheme. There would be serious policy implications if the statute of limitations is not applicable to terminated plans. That would mean that claims could be brought for decades, even centuries, after an initial claims denial. If a plan is terminated, this would make plan administration impossible and would overwhelm our federal judicial system. Are you asking us to rule that any individual with a time-barred claim for denial of benefits automatically forfeits those vested benefits? Yes, I am saying that, Your Honors. Would we be the first court to make such a proposition of law? Is there anybody else that's decided that? So there are cases, Your Honor, where participants have brought claims for benefits that were vested, and courts have found that because their claims were time-barred, they were not entitled to recover those benefits. I'm sorry, I missed the set-up, but you're saying statute of limitations precluded their commencement of the action under the relevant statute of limitations? Yes, Your Honor. You don't have an example of a non-suing beneficiary participant being barred in an overall distribution as a result of the statute of limitations, do you? Distribution where a plan is being terminated? So I don't believe that there is a case that's directly on point. This is a case of first impression, Your Honor, I believe. But the Macy's case, which was cited in our briefs to the district court, is a prime example of a case where the beneficiaries brought claim for vested benefits, but because that claim was brought after the statute of limitations period had expired, they were denied recovery of those claims. So, Your Honors, if I may, I'd like to speak for a moment about the effect of the statute of limitations on standing to bring claims, which I think is important. If the statute of limitations applies, then as a matter of law, Brow and Launderville do not have, and did not have as of the date the complaint was filed in this action, colorable claims. So when the statute of limitations period has run, individuals are no longer participants, as that term is defined in ERISA, and do not have a right to participate in any remedial scheme, therefore. This is dictated by the Chuck case. This was a case brought under the civil enforcement section 1132A1, which provides that claim under that section of the statute must be brought by either a participant or a beneficiary. If at the time a plaintiff initiates a lawsuit, the claim is time barred, the plaintiff is not a participant under ERISA and lacks standing to bring suit. I'd like to speak to another standing issue, if I may, Your Honors. Lucille Launderville, who was a breach and co-fiduciary, she lacks standing for another reason. She lacks standing because the amount that she assisted in misdirecting out of the plan exceeds her plan account balance. So the amount of plan assets that she, as a fiduciary to the plan, advised Mr. Laumeister to withdraw from the plan account, $350,603 as of 2004, exceeds her plan account balance, which is $189,514. So the district court cited the Parker case in allowing the offset of Ms. Launderville's benefits against the amount that she owes to Mr. Laumeister in contribution, which is correct. But there are actually two legal principles in the Parker case, one of which is the offset exception to the anti-alienation provision, where a fiduciary or participant owes money to a plan. But she's not liable to the plan, right? She's liable to Mr. Laumeister. That is true, Your Honor. But even if the offset exception does not apply here, when the damages that are suffered by the plan as a result of the actions taken by a participant who is also a fiduciary exceed that participant's account balance, that participant no longer has an interest in the plan and does not have a colorable claim to benefits. Because Ms. Launderville no longer has an interest in the plan or a colorable claim to benefits, she should not be included in the remedial scheme that was implemented by the district court. And that principle is also in the Parker case, Your Honors. So since I have one minute remaining, I'd like to speak about the treatment of the excess assets. So the difference between the restoration award amount and the amount of viable claims that have already been paid out to the participants. The Bennett case, Bennett v. Conrail, which was cited by this court in its 2021 ruling, allows for the retention of excess assets by the employer. So with that, Your Honors, I would like to thank you for considering our arguments and for your time. I just have one question. On the district courts, tell me if you disagree, but didn't seem to include CTC in its allocation of responsibility. Did it? There was no, there's no mention of it. And our Brown one did indicate it should. Yes, Your Honor. So what do we do about that? Well, Your Honor, I think that I would interpret the absence of statement on liability for CTC Corporation as meaning that it has no liability. The liability is zero. But others would say that since it was not specifically determined by the district court, that it should be determined on remand, that the issue is not right for appeal at this point. Not right for appeal. I didn't understand that in your briefs either. I still don't. Because? The district court didn't do something it was directed to do under a prior mandate that's on appeal. And so why not? Wouldn't we, at the very least, remand for the district court to determine CTC's allocation of liability among among the three, the two people in the one entity? That would be reasonable, Your Honor. If the district court's silence is, if we cannot interpret from the district court's silence that CTC's liability is zero, then yes, I would agree with that. Thank you. Thank you. Thank you. Thank you, Your Honors. The two issues just raised by the defendant's counsel have to do with sexual limitations and the offset of Ms. Launderville's benefits. What I want to emphasize is that what defendants are asking for under both of those issues is to keep for themselves part of what they owe to the plan. They are. And there is no way to get there under ERISA. The Bennett v. Conrail case was a defined benefit case. Defined benefit plans end up with excess benefits because you've got a plan fund, and you've got defined benefits that are paid out according to the plan's description of how much people are going to be paid over their lifetimes, and then there are these annuities. And so we don't have that. This is an individual account plan where the amount in the plan is allocated among accounts, and it equals the benefits. It does. There is no set of circumstances where they ever get to keep any of the money. And I think that's really the primary point. Secondary point or a couple of additional points on both statute of limitations and this offset issue that I want to make is under statute of limitations, it's probably simple as just for this court to affirm the district court's decision to include Berle and Launderville on the ground that the statute of limitations hadn't run. That is abundantly clear. The standard is that there has to have been a clear repudiation of benefits. Not only was there no clear repudiation, there was a repeated written affirmation that they would be paid. And there was money to pay them. CTC, according to the record, still has assets, still has real estate. That's pointed out in the brief. There was no point when there was going to be this inability to pay, and they weren't even 65 when the case was filed. That's in the record, too. They weren't even eligible yet. There was never repudiation. So what guidance do we have on what clear repudiation means? The primary case is the Cary case out of this circuit. I think that's the simplest example. I did not find a case with similar facts. I don't see how this one even gets close. There has to be something that an ordinary person, I believe this is spelled out in Cary, and later I believe it's spelled out in Veltri. Veltri was a little bit different because Veltri. And sorry, just to back up, this would be an alternative ground for affirmance. That is correct, Your Honor. This would be an alternative ground, but I think it's a much simpler one because it just saves having to get into a lot of other issues about standing and things like that that are raised in the brief. But yes, I think it's Cary and then also Veltri sort of spell out that reasonable person standard. And the claims simply weren't tied back. Thank you. We'll take the case under advisement.